# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### *West Palm Beach Division*

FILED by _____ D.C.

JAN 2 2 2016

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – W.P.B.

UNITED STATES OF AMERICA

-and-

THE STATE OF FLORIDA, *ex rel.*
[UNDER SEAL]

     *Plaintiffs*,

v.

[UNDER SEAL]

[UNDER SEAL]

[UNDER SEAL]

[UNDER SEAL]

[UNDER SEAL]

[UNDER SEAL]

[UNDER SEAL]

[UNDER SEAL]

     *Defendants*.

Case No. 15-CV-81520-
**MARRA/MARGEWMA**

**Complaint for Violations of the Federal False Claims Act, 31 U.S.C. § 3729 et seq.; the Florida False Claims Act, Fla. Stat. § 68.081 et seq.; and the Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7b(b), 1395m(a)(17).**

**FILED UNDER SEAL**

**Jury Trial Demanded**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### *West Palm Beach Division*

UNITED STATES OF AMERICA

THE STATE OF FLORIDA

EX REL. DANIEL YARBROUGH

      1331 South Federal, Apt. 309
      Boynton Beach, FL 33435

AND

EX REL. CODI FLETCHER

      2822 SE Tate Court
      Port St. Lucie, FL 34952

      *Plaintiffs*,

v.

AM-MED DIABETIC SUPPLIES, INC. D/B/A
BEYOND MEDICAL USA

      5180 W. Atlantic Avenue
      Suite 107
      Delray Beach, Florida 33484

DAVID SOBLICK

      17146 Avenue Le Rivage
      Boca Raton, Florida 33496

KEITH ARONOFF

      34 Cayuga Road
      Sea Ranch Lakes, Florida 33308

CHRISTIAN MCKEON

**Case No. 15-CV-81520-MARRA/MATTHEWMA**

**Complaint for Violations of the Federal False Claims Act, 31 U.S.C. § 3729 et seq.; the Florida False Claims Act, Fla. Stat. § 68.081 et seq.; and the Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7b(b), 1395m(a)(17).**

**FILED UNDER SEAL**

**Jury Trial Demanded**

MBKD, LLC

> 5180 W. Atlantic Avenue
> Suite 107
> Delray Beach, Florida 33484

ROBIN SOBLICK

> 17146 Avenue Le Rivage
> Boca Raton, Florida 33496

DOES 1-100

AND

AJT DIABETIC, INC., D/B/A COUNTRYWIDE
MEDICAL

> 8500 Almeda Genoa, Suite 112
> Houston, Texas 77075

*Defendants.*

# FIRST AMENDED COMPLAINT

## INTRODUCTION

1.      Qui tam Relators Daniel Yarbrough and Codi Fletcher (collectively "Relators"),

by their attorneys, individually and on behalf of the United States of America and the State of

Florida, file this complaint against Defendants AM-Med Diabetic Supplies, Inc. ("AM-Med")

d/b/a Beyond Medical USA, David Soblick, Keith Aronoff, Christian McKeon, Robin Soblick,

DOES 1-100, MBKD, L.L.C. ("MBKD"), and AJT Diabetic Inc. d/b/a Countrywide Medical

("Countrywide Medical") (collectively "Defendants") to recover damages, penalties, and

attorneys' fees for violations of the Federal False Claims Act, 31 U.S.C. § 3729 et seq.; the

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Yarbrough, et al. v. AM-Med Diabetic Supplies, Inc. d/b/a Beyond Medical
USA, et al.*
3

Florida False Claims Act, Fla. Stat. § 68.081 et seq.; and the Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7b(b), 1395m(a)(17).

2.      MBKD is the parent company of AM-Med and is owned by AM-Med's owners, David Soblick and Aronoff.

3.      Yarbrough was a Sales Manager at AM-Med and was employed by AM-Med from September 2012 to October 22, 2015.

4.      Fletcher was an Assistant Manager at AM-Med and was employed by AM-Med from September 2013 to October 22, 2015.

5.      On or about October 22, 2015, AM-Med began redirecting its customers to Countrywide Medical, after the Centers for Medicare & Medicaid Services ("CMS") began a probe where AM-Med's national provider identifier (NPI number 1518968379) was revoked. AM-Med, David Soblick, Aronoff, and McKeon are continuing to perpetuate the fraud either directly or through Countrywide Medical.

6.      Hereinafter, references to AM-Med in the present tense refers to AM-Med's actions either directly or through Countrywide Medical.

7.      Robin Soblick is the Director of Countrywide Medical and wife of David Soblick.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

9.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because the corporate defendants, AM-Med and MBKD are headquartered in and

conduct business within this judicial district, the individual Defendants reside in and regularly conduct business within this judicial district.  This Court has personal jurisdiction over Countrywide Medical, which is headquartered in Texas, but regularly conducts business within this judicial district including out of an office within this judicial district.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(c) and 28 U.S.C. 2732(a) because the complained of illegal acts giving rise to this action occurred within this judicial district and because AM-Med and MBKD are headquartered in and the individual Defendants reside in this judicial district.

## THE PARTIES

11.     Relator Yarbrough is a citizen of the United States and a resident of Boynton Beach, Florida.

12.     Relator Fletcher is a citizen of the United States and a resident of Port St. Lucie, Florida.

13.     Relators Yarbrough and Fletcher are the "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B), and state that their knowledge of the information contained herein has not been publically disclosed.

14.     Yarbrough began working at AM-Med in September 2012 at its Delray Beach, Florida location and was eventually transferred to AM-Med's Port St. Lucie, Florida location.

15.     Fletcher began working at AM-Med in September 2013.

16.     Both Yarbrough and Fletcher worked out of AM-Med's Port St. Lucie, Florida office until it closed the office on September 18, 2015.

17.     Yarbrough had approximately thirty (30) to forty (40) Sales Representatives that reported to him in the Port St. Lucie office.

18.     Fletcher also reported to Yarbrough as the Assistant Manager.

19.     After AM-Med closed its Port St. Lucie office, Yarbrough began working out of AM-Med's Delray Beach, Florida office, and Fletcher began working from home.

20.     Yarbrough and Fletcher worked for AM-Med until it terminated them on October 22, 2015.

21.     Defendant MBKD's principal place of business is 5180 W. Atlantic Avenue, Suite 107, Delray Beach, Florida 33484.

22.     MBKD is the parent company of AM-Med and is owned and managed by the same owners who own AM-Med, David Soblick and Aronoff.

23.     Defendant AM-Med is a Florida company incorporated on June 26, 2002.

24.     AM-Med's principal place of business is the same as MBKD's principal place of business: 5180 W. Atlantic Avenue, Suite 107, Delray Beach, Florida 33484.

25.     AM-Med is one of twenty companies licensed through CMS' National Mail-Order Program of diabetic supplies.

26.     AM-Med sells a wide range of medical equipment, including but not limited to braces, hospital beds, continuous positive airway pressure ("CPAP") machines, diabetic supplies, wheelchairs, scooters, lifts, and oxygen machines.

27.     AM-Med sells supplies nationally with substantial sales in Florida.

28.     AM-Med sells supplies to a substantial number of Medicare, Medicaid, and TRICARE beneficiaries.

29.     For the following states, AM-Med contracted with their Medicaid programs as the primary and secondary: Alaska, Arizona, Florida, Idaho, Illinois, Indiana, Michigan, Mississippi, Minnesota, Nebraska, North Dakota, Oklahoma, Oregon, South Dakota, Tennessee, Vermont, Virginia, Washington, Montana, and Kentucky.

30.     For the following states, AM-Med contracted with their Medicaid programs as the only the secondary: Arkansas, California, Colorado, Connecticut, Georgia, Hawaii, Iowa, Kansas, Louisiana, Missouri, Maine, Maryland, Nevada, New Mexico, New York, Ohio, Pennsylvania, Rhode Island, South Carolina, Utah, Wisconsin, and Wyoming.

31.     While each state Medicaid program is run by the individual state, the federal government does provide federal funds to each state Medicaid program. As such, federal dollars are implicated in each claim reimbursed by a state Medicaid program.

32.     TRICARE is a federally funded health care program for uniformed service members and their families. As such, federal dollars are implicated in each claim reimbursed by TRICARE.

33.     Most of AM-Med's TRICARE beneficiaries have TRICARE as their insurance secondary to Medicare.

34.     AM-Med also maintained a location in Port St. Lucie, Florida, which Relators worked out of until AM-Med closed the Port St. Lucie office in approximately September 2015. AM-Med did not register its Port St. Lucie office with CMS.

35.     AM-Med employed approximately fifty (50) Sales Representatives until approximately October 22, 2015.

36.     Defendant Aronoff is the Owner, President, Director, and Secretary of AM-Med.

37.     Aronoff is also associated with various companies mostly related to the medical industry in Florida:  K & D Billing, L.L.C.; Quality Medical Products, L.L.C.; Kc Health Care, L.L.C.; MBKD, L.L.C.; MBKD, Inc.; Family Autorama, Inc.; Impulze Items, L.L.C.; Impulze Items, L.L.C.; Southwest Medical I.P.A., P.A.; and The Medical Center at Ocean Reef, Inc.

38.     Defendant David Soblick is the Owner, Vice President, Director, and Treasurer of AM-Med.

39.     David Soblick is also associated with various companies in Florida:  K & D Billing, L.L.C.; Life Quality Home Health Care, Inc.; MBKD, L.L.C.; MBKD, Inc.; Quality Medical Product, L.L.C.; Pharmacy (18), Inc.; Holmes Detective Bureau, Inc.;  Woodfield Stables, Inc.; More N More Racing Stables, Inc.;  and U.S.A. Generation Apparel, Inc.

40.     Since as late as September 2015, David Soblick has been planning to open a mail-order pharmacy.

41.     David Soblick tasked Yarbrough with managing part of the pharmacy's employees.

42.     Aronoff and David Soblick previously owned a company called Quality Medical, which they sold.  Prior to the sale, they launched AM-Med to dodge a non-compete provision in the sales agreement.

43.     Aronoff and David Soblick are both Managers of K & D Billing, L.L.C., which does the billing for AM-Med.

44.     Yarbrough reported to both David Soblick and Aronoff.

45.     Defendant McKeon was the Sales Manager for AM-Med's Delray Beach office.

46.     McKeon was the self-proclaimed Sales Director of AM-Med.

47.    McKeon reported to both David Soblick and Aronoff.

48.    McKeon instructed AM-Med's Sales Representatives to engage in illegal activities.

49.    Prior to AM-Med closing its Port St. Lucie office, approximately thirty-six (36) Sales Representatives reported to McKeon in the Delray Beach office.

50.    After AM-Med closed its Port St. Lucie office, all Sales Representatives who were not terminated reported to McKeon; approximately, fifty-six (56) Sales Representatives reported to McKeon, including six (6) who worked from home.

51.    McKeon is also associated with the following companies:  Kc Health Care, L.L.C.; Direct Auto Transport, Inc.; and McKeon & Associates, L.L.C.

52.    DOES 1-100 represent all of the currently unknown physicians who sign off on prescriptions without medical necessity.

53.    Countrywide Medical is incorporated in Texas.

54.    Countrywide Medical's Director is David Soblick's wife, Robin Soblick.

55.    Countrywide Medical sells medical supplies and equipment nationwide focusing on orthotic braces including back braces, knee braces, ankle braces, wrist braces, and seat lift devices.

56.    Robin Soblick is also associated with various companies, including Life Quality Home Health Care, Inc. and Quality Medical Products, L.L.C.

57.    On or about October 22, 2015, CMS revoked AM-Med's NPI number.  As a result, AM-Med redirected its business to, and is operating through, Countrywide Medical (NPI number 1437385069).

58.     Countrywide Medical is operating out of the same building as AM-Med and MBKD and is next door to AM-Med's office within the building: 5180 W. Atlantic Avenue, Delray Beach, Florida 33484.

## BACKGROUND

**a. AM-Med Generally**

59.     AM-Med is one of twenty (20) companies licensed through CMS' National Mail-Order Program of Diabetic Supplies, which is a competitive bid program.

60.     AM-Med entered into contracts with some of the companies who did not obtain a license through CMS's National-Mail Order Program.  Under this arrangement in exchange for compensation ($100 per order), AM-Med would receive the companies' customers, process the orders, ship the orders, and bill for the orders.

61.     In the last three (3) years, AM-Med has had 93 complaints closed with the Better Business Bureau, which include beneficiaries receiving multiple unauthorized and unwanted supplies that were billed to the beneficiaries' insurance.

62.     Prior to the closing of AM-Med's Port St. Lucie office, AM-Med required all employees who worked out of the Port St. Lucie office to inaccurately identify themselves as from AM-Med's Delray Beach office each time they called a beneficiary.

63.     Prior to the closing of AM-Med's Port St. Lucie office, McKeon took overrides from AM-Med's revenue office to take revenue from other offices and allocate it to the Delray Beach office.

64. McKeon intentionally would not distribute commissions for sales earned or would reduce the commissions for AM-Med employees, including Yarbrough and Fletcher.

65. AM-Med violates Federal Trade Commission laws regarding telemarking by repeatedly calling individuals every day and continuing to call after the individual states that he or she does not want to receive calls from AM-Med anymore and requests to be removed.

Save | Save & Return | Save & New | Cancel | Check Spelling

'atient Information: = Required Information

PATIENT INFO

Initial Patient Type [SELECT] Patient Status Do Not Call

Patient Notes

Renald Dinvil - 9/29/2015 10:49:02 AM
DNC

Erica Harrison - 5/27/2014 9:18:59 AM
PT. CALLED IN AND VERIFIED ACCT. PT SAYS THAT HE HAS CALLED SEVEREAL TIMES AND ASKED THAT HIS NUMBER BE TAKE OFF THE CALLING LIST. PT SAYS THAT HE ALREADY CALLED MCR AND REPORTED FRAUD. PT STTD THAT HE PROMISES THAT IF HE GETS ANYMORE CALLS HE WILL CALL THE BBB, MCR , ETC AND HAVE BUSINESS SHUT DOWN. APOLOGIZED TO PT LET HIM KNOW THAT I WILL HAVE HIS NUMBER REMOVED FROM THE DIALER. PT WANTS TO SPEAK WITH SUPERVISOR AND MAKE SURE ITS UNDERSTOOD THAT HE DOES NOT WANT ANY CALLS.

Ian Feinstein - 3/3/2014 10:41:48 AM
BSAED ON THE PT, THEY HAVE ABOUT 1 WEEK OF SUPPLEIS LEFT (7TS AND LANCETS) PT REQ TS, L, CS, LD, B,M @1XDAY NON INS

Edit | Printable View | Go to Campaign

IENT INFO

Initial Patient Type 65+ MA Patient Status Refill Call

Patient Notes

**Renald Dinvil - 6/18/2014 12:56:47 PM**
**PT WANT TO BE PLACE ON DO NOT CALL LIST**

**Chelsey Amaya - 5/13/2013 10:32:57 AM**
**DID NOT SEE NOTE BELOW PT STATED HER INS IS NOT COVERING THIS AND SHE NO LONGER WANTS TO RECEIVE SUPPLIES**

**David Hernandez - 3/4/2013 4:35:20 PM**
**Pt Called in, verified ID. pt stated that she doesnt want to receive anymore supplies from our company. i told her that i would update the acct and make sure that nothing it auto shipped. pt agreed.**

66.     AM-Med often continues calling beneficiaries until the beneficiaries complain to Medicare, and Medicare calls AM-Med to close or confirm that that the beneficiaries' accounts are closed.

67.     According to AM-Med's Accountant, Nelson Collins, AM-Med only paid approximately $90,000 in corporate taxes in 2014, and thus, likely is misreporting its earnings to the Internal Revenue Service.

68.     AM-Med bills at the maximum level it can.  For example, for a $50 back brace AM-Med will bill approximately $4,200.

**b. Supplies**

69.     Durable medical equipment ("DME") is defined as equipment which: "[c]an withstand repeated use; [i]s primarily and customarily used to serve a medical purpose; [g]enerally is not useful to a person in the absence of illness or injury; and [i]s appropriate for use the [patient's] home."  Centers for Medicare & Medicaid Services, *Medicare Claims Processing Manual Chapter 20 – Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS)*, 10.1.1 – Durable Medical Equipment (DME), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c20.pdf.

70.     DMEs include items such as iron lungs, oxygen tents, hospital beds, wheelchairs, blood testing-strips, and blood glucose monitors.  42 U.S.C. § 1861(n).

71.     The rental or purchases of DMEs are reimbursable by Medicare if "[t]he equipment meets the definition of a DME . . .; [t]he equipment is necessary and reasonable for the treatment of the patient's illness or injury or to improve the functioning of his or her malformed body member…; and [t]he equipment is used in the patient's home."  Centers for

Medicare & Medicaid Services, *Medicare Benefit Policy Manual Chapter 15 – Covered Medical and Other Health Services, available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c15.pdf.

72.     In order for a DME to be covered, it must be necessary and reasonable.  A DME is necessary for the treatment of an illness or injury or to improve the functioning of a malformed body member; generally, medical necessity can be established through a physician's prescription. A DME is reasonable if the expense to the program is not disproportionate to the therapeutic benefits; the item is not substantially more costly than a realistically feasible alternate; and the item does not serve essentially the same purpose as equipment already available to the beneficiary.  Centers for Medicare & Medicaid Services, *Medicare Benefit Policy Manual Chapter 15 – Covered Medical and Other Health Services, available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c15.pdf.

73.     Medical supplies are also covered if they are necessary for the effective use of the DME and must be reasonable and necessary for the treatment of illness or injury or to improve the functioning of a malformed body member. *Id.*

74.     Braces are semi-rigid devices which are used for the purposes of supporting a weak or deformed body member or restricting or eliminating motion in a diseased or injured part of the body.  Braces include leg, arm, back, and neck braces; trusses; and artificial limbs and eyes.  Braces are covered by Medicare Part B when furnished incident to a physician's services or prescription (also called an order).  Centers for Medicare & Medicaid Services, *Medicare Benefit Policy Manual Chapter 15 – Covered Medical and Other Health Services,* 130 – Leg,

Arm, Back, and Neck Braces, Trusses, and Artificial Legs, Arms, and Eyes, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c15.pdf.

75.     Suppliers are required to obtain a prescription (order) from the treating physician before dispensing any durable medical equipment, prosthetics, orthotics, or supplies to a beneficiary or else the items are not covered by Medicare.  Additionally, suppliers must keep the prescription on file. Centers for Medicare & Medicaid Services, *Medicare Program Integrity Manual Chapter 5 – Items and Services Having Special DMS Review Considerations*, 5.2.1 – Physician Orders, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/pim83c05.pdf.  Furthermore, the prescription must have a start date and be sufficiently detailed to include all options or features. *Id.*  The physician must review the detailed description and *personally* sign and date the order.   Under 42 C.F.R. 410.38(g), all DME contractors are required to ensure that written prescriptions are consistent with the CMS Program Integrity Manuals.

**c.  AM-Med Customers Generally**

76.     Many of AM-Med's and now Country Wide Medical's customers have diabetes or sleep apnea and have an ongoing need for supplies.

77.     AM-Med maintains approximately 20,000 to 25,000 diabetic and sleep apnea customers.

78.     AM-Med gets approximately 500 to 1,000 new customers per day.

79.     AM-Med has high customer turnover due to poor service.

### d.  Purchasing Patient Lists

80.      The purchasing and selling of patient or beneficiary lists implicates the Anti-Kickback Statute.  42 U.S.C. § 1320.

81.      The Anti-Kickback Statute prohibits the exchange of anything of value to induce the referral of federal health care program business, including the purchasing of referrals.  *See id.*

82.      The Anti-Kickback Statutes permits the purchasing of non-qualified leads (lists).  However, purchasing leads that contains healthcare and patient information such as the patients' physician names, insurance information, Medicare ID numbers, age, illnesses or medical conditions, or products used then the lead is considered a referral.  Additionally, if the lead company verifies the patients or beneficiaries information to ensure they are eligible for healthcare services, then the list may also be considered a prohibited referral even if it does not contain specific healthcare and patient information

83.      Purchasing patient or beneficiary lists that contain healthcare and specific patient information is prohibited under the Anti-Kickback Statute.

### e.  Waiving Co-Payments

84.      The Anti-Kickback Statute prohibits any person to offer to, or transfer, remuneration to any beneficiary that the person knows or should know is likely to influence the beneficiary to order to receive any item or service for which payment may be made by any federal health care program, including Medicare, Medicaid, and TRICARE.  42 U.S.C. § 1320a-7a(a)(5).

85.      Waiving beneficiaries' co-payments induces beneficiaries to order and re-order products.

### f.  Marketing to Patients

86.     The Anti-Solicitation Statute prohibits the supplier of a covered item from contacting a beneficiary by telephone regarding the furnishing of a covered item subject to three (3) exceptions:  1) the beneficiary has given written permission; 2) the supplier has previously provided the covered item to the beneficiary and the supplier is contacting the beneficiary regarding the covered item; 3) or the telephone contact is regarding the furnishing of a covered item other than an item already furnished to the beneficiary, and the supplier has furnished at least one covered items to the beneficiary during the preceding fifteen (15) months.  42 U.S.C. § 1395m(a)(17).

## FACTUAL ALLEGATIONS

### a.  Defendants Illegally Purchase Lists of Beneficiaries

87.     McKeon, Aronoff, David Soblick, and Information Technology Manager Athanasios (Thanasi) Ziros are involved in purchasing lists of Medicare, Medicaid, and TRICARE beneficiaries.

88.     The purchased patient lists include various information about the beneficiaries including names, addresses, social security numbers, insurance numbers, and treating physicians. The specific information included on the purchased lists varies.

89.     AM-Med purchases the lists weekly.

90.     AM-Med purchases the lists from Equinity and other vendors, but the lists are coded so that the vendors cannot be identified.

91.     McKeon purchases lists through a person called "Churchill." McKeon paid Churchill $3,000 to $7,000 per week for the lists Churchill supplied. McKeon often made the payments to Churchill by a check or credit card.

92.     AM-Med spends approximately $7,000 to $14,000 per week on purchasing the lists.

93.     AM-Med uses the lists to market directly to the beneficiaries on the lists, including sending unordered products to beneficiaries.

94.     After receiving the lists, AM-Med enters the information on the lists into its automatic "59" dialer system.

**b. Defendants Market Directly to Beneficiaries**

95.     AM-Med's Sales Representatives use an automatic "59" dialer to call Medicare, Medicaid, and TRICARE beneficiaries on the purchased patient lists.

96.     If a beneficiary answers the telephone call, the representative begins with, "I hear you have requested information…" or "we're calling in regards to an inquiry" even if the beneficiary has never requested any information from AM-Med or ever had any prior contact with AM-Med.

97.     AM-Med rarely to never receives any requests for information from beneficiaries.

98.     AM-Med directs its Sales Representatives to ask if the beneficiary has any back pain, knee pain, or another common complaint.

99.     When the beneficiary states that he or she has pain, another common complaint, or a potential need for a medical device, the Sales Representative asks the beneficiary for his or

her Medicare, Medicaid, or TRICARE insurance information and primary care physician, if AM-Med does not already have the information.

### c.  Defendants Send Unrequested Equipment and Supplies

100.   Medicare advises beneficiaries not to accept "free" mail-order diabetic supplies that the beneficiaries did not order and to report the supplier to Medicare's Fraud Hotline.[1]

101.   AM-Med orders and sends equipment, supplies, and refills to beneficiaries that the beneficiaries never requested, and then bills these products to Medicare, Medicaid, and TRICARE.

| Daniel Yarbrough | |
|---|---|
| **From:** | Christine Bedford |
| **Sent:** | Monday, August 31, 2015 1:39 PM |
| **To:** | Daniel Yarbrough |
| **Subject:** | pt did not request these products |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Pt. name is GLORIA ▓▓▓▓▓▓▓▓▓▓▓▓ Rep. name is Melissa Noriega, pt. states that the rep said she was sending info. Pamphlet to her doorstep. Pt. did not request these products, (bb and afg's )her doctor even said she requested and she was surprised because she did not ask for these products.

102.   Sales Representatives almost always process refills without ever speaking with the beneficiary.

103.   Sales Representatives are instructed to write in their electronic notes that they actually spoke with the beneficiary and to invent a false narrative stating that the beneficiary

---

[1] https://www.medicare.gov/what-medicare-covers/part-b/dme-diabetes-national-mail-order-program.html

requested equipment, supplies, and/or refills when they never spoke with the beneficiary or the beneficiary did not request or authorize the supplies ordered.

104. For example, Sales Representative Chris Sharp added a back brace to Larry P.'s order and falsely wrote in the patient notes that Larry. P complained of back pain and requested a back brace in order to substantiate the back brace order.

105. Later, when Fletcher spoke with Larry P., Larry P. told Fletcher that he does not have back trouble and did not request a back brace.

| | |
|---|---|
| | **Codi Fletcher - 9/21/2015 6:47:50 PM**  UNDER THE IMPRESSION HE WAS SPEAKING WITH A LADY, AND SHE MISUNDERSTOOD WHAT HE SAID  ⌃ |
| **Patient Notes** | **Codi Fletcher - 9/21/2015 6:47:12 PM**  PT SAYS THERE WAS A MISUNDERSTANDING...NO BACK TROUBLE, JUST TROUBLE WITH BONE SPURS AND FOOT PAIN |
| | **Codi Fletcher - 9/21/2015 6:44:10 PM**  CALLED PT RE BB RC, SAYS HE HAS NO TROUBLE WITH HIS BACK..  ⌄ |
| | Chris Sharp - 9/21/2015 4:20:07 PM |
| **QuickNotes** | Click Me!            Last Modified By  Codi Fletcher, 09/21/2015 06:51:13 PM EDT |

| | | | |
|---|---|---|---|
| | Edit | Printable View | Go to Campaign |
| **PATIENT INFO** | | | |
| Initial Patient Type | **Diabetes** | Patient Status | **Refilled** |
| | PATIENT STATED USING ONE TOUCH | | |
| | **Chris Sharp - 9/21/2015 4:19:07 PM**  BASED ON THE INFO GIVEN FROM THE PATIENT REQUESTED TS/L/CS/LD/BATT/M FOR 1XD  ⌃ | | |
| **Patient Notes** | **Chris Sharp - 9/21/2015 4:09:44 PM**  PT EXP HYPERTENSTION, BONE SPURS, BACK PAIN, PAIN IN THE FOOT. PT STATED DOCTOR APPLIED FOR A HANDICAP STICKER BECUASE OF SEVERE FOOT PAIN. WORSE IN THE LEFT FOOT | | |
| | **Chris Sharp - 9/21/2015 4:08:06 PM**  BASED ON THE INFO GIVEN FROM THE PATIENT REQUESTED BACK BRACE  ⌄ | | |

106. For example, Sales Representative Timothy Tully falsely wrote in the patient notes for Thomas N. that Thomas N. requested a back brace. Fletcher spoke with Thomas N.'s wife who stated that Thomas N. does not have any back trouble and does not see the physician that AM-Med had on file for Thomas N.



Edit | Printable View

PATIENT INFO

Initial Patient Type

Patient Status **Patient Owned**

Patient Notes

**Codi Fletcher - 9/29/2015 6:47:53 PM**
**PT WIFE SAYS HE DOESNT SEE DR SCHWARTZ AND DOESNT HAVE ANY BACK TROUBLE**

**Timothy Tully - 3/26/2015 4:13:24 PM**
**BASED ON INFO PROVIDED BY PT, PT REQUESTED FOR BACK BRACE SIZE (XL). PT AGREES TO ACCEPT SUPPLIES FROM BMUSA. PT'S Password is (MARCELLA) and hint is (WIFE).**

**Timothy Tully - 3/26/2015 4:13:14 PM**
**BASED ON INFO PROVIDED BY PT, PT REQUESTED FOR HWO. - PT REQUESTED (M) HANDS/WRISTS. PT AGREES TO ACCEPT SUPPLIES FROM BMUSA. PT'S Password is (MARCELLA) and hint is (WIFE).**

**Timothy Tully 3/26/2015 4:13:05 PM - BASED ON INFO PROVIDED BY PT, PT REQUESTED TENS UNIT. PT AGREES**

QuickNotes Click Me!

Last Modified By **Codi Fletcher, 09/29/2015 06:48:10 PM EDT**

107. In May 2014, Joseph W., Jr. requested to close his account with AM-Med because he found a new supplier. However, AM-Med continued to send Joseph W., Jr. products and falsified notes stating that he requested the products.

Edit | Printable View | Go to Campaign

PATIENT INFO

Initial Patient Type **Diabetes**

Patient Status **Refill Call**

Patient Notes

**Joseph Dauch - 3/11/2015 10:31:17 AM**
**BACK BRACE - Based on the information provided by the Patient, PATEINT REQUESTED FOR BACK BRACE SIZE (L). PT AGREED TO ACCEPT SAID SUPPLIES FROM BMUSA**

**Chandlar Maiden - 6/4/2014 9:52:42 AM**
**AFG LEAD NOTES - PT REQUESTED FOR SIZE (10 1/2) AFG**

**Erica Harrison - 5/8/2014 12:59:01 PM**
**CALLED PT REGARDING SECONDARY INSURANCE. PT SAYS THAT HE IS NOW GETTING HIS SUPPLIES LOCALLY, SO WOULD LIKE TO CANCEL. CANCELLING ACCT.**

**Erica Harrison - 5/1/2014 9:48:44 AM**

108. In late-September to the end of October 2015, Yarbrough sat at a desk near the Sales Representatives who exclusively handle refills. Yarbrough never heard any of them make a phone call to or talk with any beneficiaries. However, these Sales Representatives each process approximately 100 refill order per day.

109.    Sales Representatives and the Data Entry Department often send more than one of the same product to the beneficiary.  For example, if a beneficiary requests a right knee brace, AM-Med will send the customer both right and left knee braces even when the beneficiary only needs one knee brace.

110.    AM-Med bills for all of the products it sends to beneficiaries.

111.    Sales Representatives and the Data Entry Department also send products that the beneficiaries did not order.  AM-Med sends back braces to any beneficiaries who complaint of back pain even if a brace has not been recommended by the doctor; Sales Representatives are instructed by AM-Med to ask beneficiaries if they have back pain and other common complaints. AM-Med bills for all of the products it sends to beneficiaries.

112.    AM-Med strongly discourages beneficiaries from returning products and often tells beneficiaries they can keep the items for free.  However, AM-Med still bills for these products.

113.    For example, Jerry L. called AM-Med about supplies he started receiving that he never ordered.  AM-Med told him to keep the supplies, but continued to send him more supplies for months.

| Save | Save & Return | Save & New | Cancel | Check Spelling |

atient Information:                                          ☐ = Required Information

PATIENT INFO

Initial Patient Type  65+ MA ▾                    Patient Status  Refill Call ▾

Patient Notes

Tornell Campbell - 11/27/2013 9:19:59 AM
pt called in stating  that we keep sending him supples and he already  called in and canceled his
acct. pt stated that he got supplies from ous and he already sent it back. pt stated that he doesnt
have medicare, medicaid  and he doesnt need the supplies. i told pt i apologize for the inconvience
and ill update his acct so that nothing  further will shipped. pt agreed

Shakarra Patterson - 8/29/2013 5:13:25 PM
pt called in,verified id.pt stated that he did not order the supplies hes being telling us that since
may and he keep getting supplies,pt wants to cancel this acct. I explained to him that he set up an
password and spoke with a rep regarding supplis but doesnt remember ordering supplies.

David Hernandez - 6/10/2013 3:23:27 PM
pt called in, verifeid ID. pt stated that he received supplies and he doesnt need it. i  let him know
that he s/w  our rep and the Dr signed the RX. i told him that at this time he should keep the
supplies. pt agreed to do so.

QuickNotes  Click Me!                    Last Modified By  Thanasi Ziros, 08/25/2015 04:41:12 PM EDT

114.    Gordon S.'s wife requested to return supplies and close the account with AM-

Med.  AM-Med told her that she could keep the supplies for free.

| Save | Save & Return | Save & New | Cancel | Check Spelling |

atient Information:                                          ☐ = Required Information

PATIENT INFO

Initial Patient Type  65+ MA ▾                    Patient Status  Refill Call ▾

Patient Notes

Helena Thompson - 6/10/2015 5:08:38 PM
NA...

Ian Feinstein - 1/29/2014 1:11:56 PM
NA

Kathryn Brown - 12/3/2013 12:16:30 PM
Pt's wife called in, verified with PT. DOB and that his wife could speak on the acct. Stated that they
received supplies and that they do not like the one touch and want to send supplies back. I told
them that one touch is the most recommended by Dr's. She stated that they still wanted to rtn and
close acct. I told her to keep the supplies and I would make sure they were not sent a bill and I
would update theacct. so no more supplies would be sent. She agreed.

Verlencia Walker - 11/11/2013 9:28:10 AM
***DUPLCATE***

115.    If a beneficiary returns an item, AM-Med will resell it.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Yarbrough, et al. v. AM-Med Diabetic Supplies, Inc. d/b/a Beyond Medical
USA, et al.*
22

116.    When AM-Med enters the products for each beneficiary, it instructs its employees to always mark the intake as complete and to always choose "both" for ankle, wrist, and knee products.

## STEPS TO INPUT PRODUCTS:

Product Status:
   o   Intake Complete (ALWAYS)

**PRODUCT:**
   c   Click on any injury's pertaining to patient

      *To select more than one press and hold (ctrl) and then select.

      *Always chose "**for both**" for ankle, wrist, and knee

      ****3WAY IS ALWAYS YES!!! ON EVERY PRODUCT ****

d.  **Defendants Falsify Patient Encounter Notes**

117.    Defendants instruct Sales Representatives to falsify telephone notes to support sending products to beneficiaries.

118.    McKeon sets daily goals for all Sales Representatives.

119.    For example, Refill Sales Representatives must secure 80 to 100 refills per day and Sales Representatives must secure twenty (20) new sales per day:

Inbox > **Message Detail**                                                                  Print

Subject:  FW: Refilling
From:  Codi Fletcher <cfletcher@beyondmedicalusa.com>  (Add as Preferred Sender)
Date:  Mon, Sep 14, 2015 9:53 am
To:  "CODI@ALLCITYTAXI.COM" <CODI@ALLCITYTAXI.COM>

From: Christian McKeon
Sent: Monday, September 14, 2015 9:47 AM
To: Renald Dinvil; Ian Feinstein; Helena Thompson; Jeffrey Hill; Troy Hayer; Helena Thompson; Codi Fletcher; Eric Taylor
Subject: Refilling

This is officially a 10-hr a day job. I need 80-100 minimum out of each of you. There are 8 of you, that means 650-800 PER DAY!

## Christian McKeon
*Director of Sales*
Toll Free:   (800) 787-6410 x1014
Direct Line: (561) 900-3514
Fax: (888) 876-2619
E-Mail:  cmckeon@beyondmedicalusa.com



120.     The sales quotas that McKeon sets are nearly impossible to meet without engaging in fraud.

121.     For example, Fletcher made approximately 100-150 calls per day; on average, only three (3) or four (4) beneficiaries per day request refills or supplies.

122.     Defendants threaten to fire any Sales Representative that does not meet the quota.

123.     Refill Sales Representatives falsify patient notes to state that they spoke with a patient when they have not.

124.     AM-Med had six (6) Refill Sales Representatives (Brandon Garner, Helena Thompson, Ian Feinstein, Jeffery Hill, Renald Dinvil, and Troy Hayer).  These six Refill Sales Representatives often claim a 100% success rate for contacting and obtaining patient authorization for refills.

125. Often, Sales Representatives do not even call the beneficiaries' telephone numbers and just automatically run the beneficiaries' information through the system and initiate an order to send products to the beneficiaries.

126. It is not possible to call as many beneficiaries as many Sales Representatives claim to call in one day.

127. The electronic patient notes in AM-Med's databases (BrightTree and Inside Sales) are time-stamped. The times entered often do not make sense or seem reasonable. Sales Representatives will claim to have made twenty (20) calls before 8:00 a.m. or claim to have made calls at 8:00 a.m. eastern standard time to a beneficiary in the pacific time zone (5:00 a.m.).

128. Sales Representatives claim to have called and spoken with a beneficiary even when the phone number is inactive or the beneficiary is deceased.

129. For example, Refill Sales Representative Ian Feinstein claimed to have called and spoken with Barbara S. on June 18, 2015, and during this conversation Barbara S. requested refills. However, when Fletcher called Barbara S. regarding a refill in September 2015, he learned that Barbara S. died on June 15, 2015, prior to when Feinstein's notes state that he spoke with Barbara S.



Edit | Printable View | Go to Campaign | Prev : N

Initial Patient Type 65+ MA

Patient Status Prospect Deceased

Patient Notes

Codi Fletcher - 9/8/2015 1:44:38 PM
PT DECEASED 6.15.2015

Ian Feinstein - 6/18/2015 12:09:15 PM
BASED ON THE PATIENT, THEY HAVE ABOUT ONE WK OF SUPPLIES LEFT (1 90 strips & lancets). REQUESTED T/S, L, C/S, LD, Batt, M @1XD NIDDM

Ian Feinstein - 2/23/2015 9:24:49 AM
BASED ON THE PATIENT, THEY HAVE ABOUT ONE WK OF SUPPLIES LEFT (1 90 strips & lancets). REQUESTED T/S, L, C/S, LD, Batt, M @1XD NIDDM

Ian Feinstein - 11/18/2014 12:17:10 PM

QuickNotes Click Me!

Last Modified By Codi Fletcher, 09/08/2015 01:46:08 PM EDT

Vendor ID

**Gender:** Female

**Eligibility Date(s):** 09/08/2015 Eligibility
06/15/2015 Date of Death

130. Additionally, Sales Representative Eric Taylor claimed to have spoken with Adele S. on July 10, 2015, and that Adele S. requested refills, which were then processed and sent to Adele S. However, Adele S. died on July 9, 2015.

Save | Save & Return | Save & New | Cancel | Check Spelling

Patient Information: = Required Information

PATIENT INFO

Initial Patient Type 65+ MA

Patient Status Refill Call

Patient Notes

Codi Fletcher - 10/2/2015 5:26:41 PM
07/09/2015 Date of Death

Eric Taylor - 7/10/2015 10:40:27 AM
PROVIDED INFORMATION GIVEN BY THE PT, THEY HAVE ABOUT 2 WKS OF SUPPLIES LEFT(14 strips & lancets), REQUESTED T/S, L, C/S, LD, M, BATT @ 1X NIDDM.

Ian Feinstein - 3/11/2015 1:33:09 PM
PROVIDED INFORMATION GIVEN BY THE PT, THEY HAVE ABOUT 2 WKS OF SUPPLIES LEFT(14 strips & lancets), REQUESTED T/S, L, C/S, LD, M, BATT @ 1X NIDDM.

Ian Feinstein - 12/15/2014 2:30:24 PM
PROVIDED INFORMATION GIVEN BY THE PT, THEY HAVE ABOUT 2 WKS OF SUPPLIES LEFT(14 strips & lancets), REQUESTED T/S, L, C/S, LD, M, BATT @ 1X NIDDM.

QuickNotes Click Me!

Last Modified By Thanasi Ziros, 09/30/2015 12:15:27 PM EDT

131.    In another example, Sales Representative Feinstein claimed to have spoken with

Betty D. on April 1, 2015 and July 1, 2015 where on both occasions Betty D. requested refills.

However, Betty D. died on January 6, 2015.



132.    Further, Lynroy T.'s wife complained that AM-Med shipped supplies every three

(3) months automatically without authorization.  The patient notes falsely state that the Sales

Representatives spoke with Lynroy T. who requested the refill orders.

133.    For example, Sales Representative Jeffrey Hill claimed to have spoken with

Stanley M. on September 24, 2015, and that Stanley M. requested a refill because he only had

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Yarbrough, et al. v. AM-Med Diabetic Supplies, Inc. d/b/a Beyond Medical
USA, et al.*
27

ten (10) days of supplies left.  Fletcher called Stanley M. that same day, and Stanley M. told

Fletcher that Stanley M. had enough supplies until January 2016.



134.    Fletcher reported to McKeon that Feinstein falsified patient notes, but McKeon

brushed it off and did not take any corrective action.

135.    Feinstein does not call any beneficiaries, creates falsified patient notes stating that

the beneficiary requested the refill, and processes the refill without ever speaking to the

beneficiary.  All of the refills that Feinstein handles are fraudulent.

136.    McKeon and Ziros alter the data, including dates and Sales Representatives' notes

in Inside Sales and BrightTree, which is used for billing to Medicare, Medicaid, and TRICARE.

137.    If a Sales Representative noted that a beneficiary requested to close the account

with AM-Med or complained that he already had another supplier, McKeon and Ziros often

would delete these notes.

**e.   Defendants Substitute Devices Without Notifying the Beneficiaries and Act Improperly Regarding Rebates and Stock**

138.   AM-Med purports to carry a variety of brands and supplies.

139.   However, AM-Med does not carry all of the brands and items it claims to carry. Instead, Am-Med only carries the brands and items that give AM-Med the best deal to allow for the highest profit items.

140.   Additionally, AM-Med receives rebates from certain brands, which directly influences what brands and items AM-Med carries.

141.   If a beneficiary requests or needs a specific brand of an item, AM-Med tells the beneficiary that the item is out of stock or is back-ordered, even if AM-Med never carried the item. Then, AM-Med just sends the item it has to the beneficiary, even if the beneficiary does not want it.

142.   Additionally, AM-Med replaces items requested with items that have higher reimbursement rates, or items that come with manufacturer rebates.

143.   Johnson & Johnson offers AM-Med rebates on blood glucose meters and discounts for prompt payment and bulk orders.

144.   AM-Med receives approximately $75,000 to $100,000 in rebates from Johnson & Johnson for ordering its blood glucose meters.

145.   AM-Med developed a scheme to generate profits by billing for as many Johnson & Johnson meters as it can.

146.   David Soblick ordered AM-Med and its employers to only carry and order Johnson & Johnson meters and to never order any other brand.

147.     AM-Med advertises as carrying a variety of meter brands, even though it only carries Johnson & Johnson meters.

148.     AM-Med instructed its Sales Representatives to call beneficiaries and push Johnson & Johnson meters on them.  AM-Med drafted multiple sales pitch documents to instruct its Sales Representatives on how to do this:

Hello is this _____? OK . This is _____ calling from am-med at beyond medical. How are you today?

I have to let you know that our call may be monitored or recorded for quality and training...

We were calling today in regards to an inquiry to get you the new Johnson & Johnson One Touch Ultra2 Meter.

## VERBATIM PITCH ENTRANCE

Good morning/afternoon is MR./MRS _____ available?

Hi, this is _____ with Am-Med Diabetic @ Beyond Medical. How are you today?

We were calling in regards to an inquiry about upgrading/replacing certain aging items that you use daily. Are you the diabetic in the household? Ok, great! We were chosen as one of the 18 companies that Medicare picked to still be licensed to service your area with your diabetic testing supplies. How many times a day are you testing? Ok, good.

Well what we are going to provide is the brand NEW One Touch Ultra testing meter and supplies! This is the most popular meter on the market, and one of the easiest to use. We send you out a three month supply, and only call you 10 days before you run out so that we can get the next order out to you promptly. OK?

149.     AM-Med's training materials and sales pitch documents states if a beneficiary says  he or she already has a meter or kit, the Sales Representative should tell the beneficiary he or she will receive a complimentary name brand meter, such as a One Touch Ultra II, which is a Johnson & Johnson meter:

*Rebuttal: "I already have a meter or kit that I can prick any part of my body with"*

1) As a complimentary service for our new patients, we send BRAND new items to replace what they have. We service you with a NAME BRAND ONE TOUCH ULTRA II meter and strips, so that your Diabetes is trusted to a reliable company like Johnson and Johnson!

150.    If a beneficiary requests a different brand than Johnson & Johnson for a blood glucose meter, AM-Med will send the beneficiary a Johnson & Johnson meter anyway without notifying the beneficiary.

151.    If the beneficiary calls and complains, AM-Med tells the beneficiary that the requested meter was backordered or unavailable.  However, AM-Med only carries Johnson & Johnson blood glucose meters despite advertising and claiming to carry a variety of brands.

152.    For beneficiaries who have sleep apnea, AM-Med pushes Resperonics masks on beneficiaries instead of other brands such as Fisher & Paykel or Resmed.  For example, AM-Med's sale pitch includes:

If they say it's been over 3 months:

> ➤ Oh! Well I'm not sure you know this but you should be replacing your mask and tubing every 3 months because you can get sick using the same one due to breathing in bacteria.

> ➤ Ok! Well, we have an upgraded mask that is very comfortable and leaves fewer lines on your face and is easy to put on and take off.

## Until further notice we are to push out Resperonics masks

HARDSHIPS: Upsell to Fisher and Paykel Only.  Resmed/Respironics = Co-pay unless using a Secondary.

153.     If a beneficiary requests an ankle foot gauntlet (AFG) for neuropathy, AM-Med will send an ankle brace instead.  AFGs and ankle braces are not interchangeable products.  The reimbursement rate for ankle braces is significantly higher than the reimbursement rates for AFGs.

| Daniel Yarbrough | |
|---|---|
| **From:** | Ellen Jones |
| **Sent:** | Monday, August 31, 2015 2:33 PM |
| **To:** | Daniel Yarbrough |
| **Subject:** | ▓▓▓▓▓▓▓▓▓▓▓ *patient* |
| Requested AFG's......Got Ankle brace instead. / *Lead Notes in Deal Say AFG.* | |

**Daniel Yarbrough**

| | |
|---|---|
| From: | Christine Bedford |
| Sent: | Monday, August 31, 2015 2:09 PM |
| To: | Daniel Yarbrough |
| Subject: | pt shipments incorrect |
| | |
| Follow Up Flag: | Follow up |
| Flag Status: | Flagged |

PT. RECVD ANKLE BOOTS, NOT THERMOS, NEEDS THERMOS (AFG) IN SZ. SM, ALSO IN SAME BOX SHE RECVD( ONE
LEFTHAND HWO,) WITHOUT SPICA,( PT NEEDS BOTH HWO WITH SPICA IN SZ. SM).PT IS DEBRA ████████████████
████████ PT STATED SHE CALLED IN TWICE FOR ME AND WAS PUT ON HOLD FOR OVER 10MINS AND THERE WAS NO
OPTION FOR ENTERING MY EXTENSION #.    *Patient requested AFG- Sent Ankle Brace*
THANKS                                    *Travel*
CHRISTINE BEDFORD

**Daniel Yarbrough**

| | |
|---|---|
| From: | Karen Cormier |
| Sent: | Monday, August 31, 2015 2:51 PM |
| To: | Daniel Yarbrough |
| Subject: | PATIENTS THAT RECEIVED ANKLE BRACE; NOT THE AFG'S. |

THESE PATIENTS CALLED TO CANCELL ALL THEIR ITEMS DUE TO THE FACT THEY WERE UNHAPPY WHAT WAS SENT . THEY
REQUESTED THE AFG'S, NOT AN ANKLE BRACE.
DANIEL ██████████████████
RONALD ██████████████████
WILLIAM ██████████████████

**f.  Defendants Waive Copayments**

154.   Sales Representatives often promise to give free devices or supplies to

beneficiaries even though most products require a copayment.

155.   As part of a sales pitch, Sales Representatives tell beneficiaries that if they are on

a fixed or limited income, AM-Med's Billing Department will provide "options:"

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Yarbrough, et al. v. AM-Med Diabetic Supplies, Inc. d/b/a Beyond Medical
USA, et al.*
33

IF MEDICARE PRIMARY:

Well, as you already know, Medicare is an 80% coverage policy, and you're responsible for your 20%.
Now, Do you have a Secondary Insurance to cover the 20% copay?

*// If YES,

Ok, what' the Member ID# and Provider Number for your Secondary Insurance.

*// If No

Ok, well, if you are on a fixed or limited income, and cannot afford your copay, when you receive your bill, just give our billing department a call back and they'll be happy to provide you with options to cover your co-payments, ok?

156. AM-Med only makes one attempt to collect the copayment and effectively waives the copayment.

157. Established AM-Med customers know that when they place orders through AM-Med, they will not have any copayments.

158. AM-Med waives copayments to induce beneficiaries to purchase supplies through AM-Med.

**g. Defendants Sent Requests for Prescriptions Directly to Physicians' Offices**

159. Often, Sales Representatives do not call or speak with the beneficiaries that AM-Med sends products to; instead AM-Med obtains the beneficiaries' information from the purchased lists, which typically contain the beneficiaries' insurance and physician information.

160. AM-Med sends prescriptions, which typically do not include a diagnosis or state a medical basis for the order, to physicians' offices for signatures.

161. AM-Med instructs its Sales Representatives to send the prescriptions to multiple doctors to ensure that at least one of the doctor's offices signs it:

## Obtaining More than 1 Doctor per Product

The more Doctors you have, that specialize in the ailment you are sending an Rx request for, will allow you a higher rate of Preship Completes.

If you sell Diabetes, AFG, Back Brace, Cpap Supplies, ED, and you have specific doctors that deal with those types of ailments, you can fax ALL THE PRESCRIPTIONS SIMULTANEOUSLY.

## Obtain 1 Specialized Doctor per Product

We all profit from Upsells.   Use multiple Doctors to get your Upsold Rx's back as fast as possible.

**If you use only ONE doctor for several orders and they do not want to sign our prescriptions, ALL your deals are dead.**

# How to get your Prescriptions back faster

Get more than one doctor per product so you have alternatives if one Doctor denies it.

Check your followup emails to know what is happening with your sales.

Tell your patient to call their Doctor's offices to verify that they requested the products and expedite their Rx Signing process.



Obtain 1 Specialized Doctor per Product

- Only obtaining One Doctor may cause a complete shutout by the Doctors Office.

If you get multiple doctors you have a higher chance of getting some prescriptions back.



Obtain 1 Specialized Doctor per Product

162.    Typically, the prescriptions are sent by fax, and AM-Med will repeatedly refax the prescriptions to the doctors, until it receives a signed prescription back.

163.     If the prescription faxes do not go through either because the fax number is incorrect or out of service or the fax line is busy, McKeon will distribute a list to Sales Representatives to obtain the correct fax information and refax it or send the prescription by mail.

164.     Commonly, physicians' offices (Does 1-100) sign off on the prescriptions assuming the patient requested the products.  Often the nurses working with the physicians sign the prescriptions and return them to AM-Med.

165.     Physicians' offices sign off on the prescriptions that AM-Med sends them even if the beneficiary has never seen the physician or if the beneficiary is no longer a patient of the physician. Physicians' offices sign off on the prescriptions without making the required medical necessity determination.

166.     For example, on October 16, 2015, Yarbrough called to get a prescription signed by Dr. Susanne Williams because the beneficiary used to be treated by Dr. Williams.  Yarbrough learned that Dr. Williams left the practice, and that Dr. Thatcher or his nurse, who replaced Dr. Williams, signed the prescription.  Yarbrough requested that AM-Med stop the order due to the improper prescription, but the Sales Representatives process the orders anyway when they encounter situations like this.



167.    As part of a kickback scheme, AM-Med hires two outside vendors called
DocsDepot and ByteSuccess to call and push physicians' offices to sign the prescriptions sent by
AM-Med.  In exchange, these vendors receive $25 for every filled prescription.

### h.  Defendants Bill the Government

168.    Defendants bill the Government for all equipment and supplies sent to Medicare,
TRICARE, and Medicaid beneficiaries.

169.    From January 2014 to February 2015, AM-Med's sales revenue was
approximately $9,080,766.38.

170.    Prior to being suspended on or about October 22, 2015, AM-Med's NPI number
was 1518968379.

171.    AM-Med is estimated to receive approximately $1,000,000 a month in
reimbursements.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Yarbrough, et al. v. AM-Med Diabetic Supplies, Inc. d/b/a Beyond Medical
USA, et al.*
38

i. **Defendants Have Knowledge of Their Fraudulent Practices**

172.    David Soblick, Robin Soblick, Aronoff, and McKeon have knowledge of AM-Med's fraudulent practices.

173.    David Soblick, Aronoff, and McKeon direct AM-Med employees to engage in fraudulent practices including but not limited to: direct marketing to Medicare, TRICARE, and Medicaid beneficiaries, sending unrequested products and supplies, substituting products and supplies, lying to beneficiaries about supplies and products, waiving copayments, and falsifying patient notes.

174.    In meetings, David Soblick, Aronoff, and McKeon would discuss the fraud that they and AM-Med were engaging in while Yarbrough was present.

175.    David Soblick directed McKeon to change the dates in the system on certain customers, direct market, and handle certain leads, including leads from the purchased patient lists.

176.    McKeon and Ziros would alter the records in Inside Sales and BrightTree.  Often McKeon would ask Ziros to change the billing dates and backdate all of the prescriptions for hundreds of patients at once.

177.    David Soblick decided that AM-Med would only carry certain items, such as the Johnson & Johnson blood glucose meters because AM-Med could earn the most profit based on rebates and discounts.

178.    David Soblick directed McKeon and AM-Med to tell customers that any items AM-Med did not carry were backordered and to only send the products AM-Med stocked regardless of whether the beneficiary requested it.

179.    David Soblick directed AM-Med to resell all returned items, including portable oxygen masks.

180.    McKeon directed his Sales Representatives in the Delray Beach office to add additional unwanted items to customer orders to increase sales and billing.

181.    McKeon directed his Sales Representatives to work off lists where the Sales Representative would confirm or obtain the beneficiaries' insurance information through Cortex which is medical billing software that can be used to verify insurance information based on social security numbers and Medicare identification numbers, and then send products to the beneficiaries without calling.  McKeon had several Sales Representatives who solely worked off these lists.

182.    Separately, Aronoff told Yarbrough to make sure that McKeon and David Soblick were not getting "too egregious with the fraud."

183.    Aronoff, concerned about AM-Med's practices would immediately walk out the back door of AM-Med's offices if any agent or investigator came to AM-Med.

184.    McKeon drafted the sales pitch documents for the Sales Representatives, which David Soblick and/or Aronoff edited and approved.   These sales pitch documents were distributed to AM-Med's Sales Representatives as part of their training and instructed AM-Med's employees to directly market to beneficiaries claiming to be calling about an "inquiry," to

always ask what other medical issues the beneficiary suffers from in order to sell additional products, and to upsell all beneficiaries.

185.    David Soblick and Aronoff instructed all employees who worked out of AM-Med's Port St. Lucie office to always identify themselves as calling from and working out of AM-Med's Delray Beach office because AM-Med's Port St. Lucie office was not properly licensed.

186.    AM-Med has been audited previously by CMS.

187.    CMS audited AM-Med at its Delray Beach location in or around February 2014; CMS was not aware of AM-Med's Port St. Lucie location.

188.    CMS learned that AM-Med bought patient lists from companies that went out of business after AM-Med won a contract with Medicare.

189.    CMS sent 5 (five) investigators and questioned the staff.

190.    David Soblick and Aronoff instructed Yarbrough and other AM-Med employees who were interviewed by CMS investigators to lie to the investigators.

191.    During CMS' investigation, McKeon and other employees altered beneficiary records in Inside Sales and BrightTree, including changing the delivery dates and lead notes.

192.    Subsequently, McKeon bragged to David Soblick and Aronoff about how he manipulated the records as CMS' investigators were sitting across from him at his desk.

193.    Several months later, the OIG issued a subpoena.

194.    AM-Med used an IT consultant to alter patient notes and other documentation in anticipation of the OIG's subpoena.

195.    After AM-Med received the OIG's subpoena, it altered documents and manipulated data in response to the OIG's subpoena. At the direction of David Soblick, McKeon, and Ziros put together most of the documents for the subpoena. However, they also instructed Sales Representatives and other employees to alter dates in response to the subpoena.

196.    CMS suspected AM-Med was doing direct marketing and told AM-Med to change its marketing practices; AM-Med did not change its business practices generally or its marketing practices specifically.

197.    Additionally, Defendants are aware of AM-Med's fraudulent practices not only due to their own direct participation in the fraud, but also because employees complained about AM-Med's fraudulent activities.

198.    Former Sales Manager in AM-Med's Port St. Lucie office, Chad Childs repeatedly complained to David Soblick and Aronoff about the fraudulent activity that McKeon was engaging in and encouraging Sales Representatives to engage in. AM-Med terminated Childs because he raised issues about McKeon and AM-Med's fraudulent activities.

199.    The day Childs was terminated, but prior to learning of his termination, Fletcher complained to Aronoff about some of McKeon's fraudulent activities.

200.    Yarbrough complained to Aronoff multiple times about how Sales Representatives were improperly pitching products.

201.    AM-Med's former Compliance Officer, Elizabeth Arsenault, raised concerns about AM-Med's fraudulent practices and ongoing non-compliance to David Soblick and Aronoff. McKeon bragged to Arsenault about how many laws he was breaking. AM-Med terminated Arsenault.

202.   David Soblick, Aronoff, and McKeon would threaten employees who complained about the fraud telling them to "shut the fuck up and do what you are told."

203.   In addition, AM-Med received beneficiary complaints on a daily basis about receiving products they never ordered, receiving products they ordered with products they did not order, receiving incorrect (substituted) products, continuing to receive products after canceling their accounts, and receiving daily calls from AM-Med (often the dialer calls the same people 6-8 times per day).

204.   Defendants also knowingly conspired with Robin Soblick and Countrywide Medical in order to continue their fraudulent scheme after CMS revoked AM-Med's NPI number.

**j.  October 2015 and Countrywide Medical Supplies**

205.   During the week of October 19, 2015, AM-Med had a hearing regarding an injunction with its status as a Medicare provider.

206.   On or about October 19, 2015, AM-Med directed all of its employees to process and send orders for products without calling the beneficiaries.

207.   AM-Med distributed lists of approximately 1,000 items to employees, including to Yarbrough, and told its employees to send the products to the beneficiaries and not to make any calls to beneficiaries.  McKeon was responsible for distributing these lists.

208.   During the week of October 19, 2015, AM-Med did not call any of the beneficiaries it sent products to, which it then billed for.

209.   On or about October 22, 2015, AM-Med's NPI number was revoked.

210.   On October 22, 2015, AM-Med fired nearly its entire staff, including Yarbrough and Fletcher, except for approximately fourteen (14) employees that it retained. The employees

retained include McKeon, Ziros, Accountant Nelson Collins, Human Resources Roberta

Dawson, Billing Manager Shanita Vickers, Data/Order Entry Manager Iman Jbali, Prescription

Manger Kelly Dambra, Customer Service Manager Keith Wade, Sales Representative Joseph

Dauch, Sales Representative Guichy Jules, and Sales Representative Ilona Bergen.

211.    These approximately fourteen (14) employees are assisting David Soblick in

continuing AM-Med's fraud through a new pharmacy (name currently unknown) that David

Soblick has set up or is in the process of setting up.

212.    Robin Soblick is also assisting with the pharmacy.

213.    David Soblick's pharmacy will sell approximately four (4) to (5) products, which

will include topical creams (likely topical pain creams) and insulin.

214.    AM-Med continues to maintain its office, website, and call service.  However, all

calls are directed to Countrywide Medical, which has an active NPI number.

215.    On October 29, 2015, Soblick, Collins, and McKeon requested that Yarbrough

meet with them at AM-Med's Delray office to discuss him helping with the pharmacy and also a

tax resolution firm that David Soblick intends on opening with Collins.

216.    When Yarbrough went to AM-Med for his meeting on October 29, 2015, there

were some employees still working in AM-Med's office.

217.    Countrywide Medical is operating out of the office next door to AM-Med's office.

218.    On October 29, 2015, Yarbrough overheard Sales Representatives in the office

next door talking to beneficiaries on the phone stating "I am going to switch you over to

Countrywide Medical" from AM-Med.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Yarbrough, et al. v. AM-Med Diabetic Supplies, Inc. d/b/a Beyond Medical
USA, et al.*
44

219.    AM-Med is redirecting all of its Medicare, Medicaid, and TRICARE beneficiaries to Countrywide Medical in order to circumvent CMS' debarment of AM-Med as a provider.

220.    Countrywide Medical is continuing to engage in the same fraud as AM-Med.

221.    Additionally, on or about October 29, 2015, David Soblick and Collins asked Yarbrough to help them start a tax resolution firm following Omni Financial's business model. David Soblick and Collins intend on using the tax resolution firm to engage in unethical practices for their own financial gains.

## COUNT I
### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
### (against Defendants AM-Med, David Soblick, Aronoff, McKeon, MBKD, and Countrywide Medical)

222.    Relators Yarbrough and Fletcher incorporate all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

223.    The False Claims Act imposes liability on any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(1)(A).

224.    Defendant AM-Med by and through its owners Defendants David Soblick and Aronoff,  officers, agents, supervisors including Defendant McKeon, employees, its parent company Defendant MBKD, and through Defendant Countrywide Medical knowingly presented or caused to be presented claims to obtain payment for devices and supplies that were not physician approved or properly physician approved, and thus, were medically unnecessary; devices and supplies that were sent to deceased beneficiaries after their death; devices and supplies that were sent without authority or authorization; devices and supplies that were

medically unnecessary, such as braces, but sent in addition to medically necessary products; and certified to Medicare that it is performing services in compliance with Medicare regulations when Defendants falsely certified compliance when they claimed to have beneficiary consent for devices and supplies.

225.    The result of Defendants' actions has led the Government to pay for medically unnecessary devices and supplies, which Defendants received payments of millions of dollars from the federal Medicare program, TRICARE, and numerous state Medicaid programs.

226.    The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## COUNT II
### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### (against Defendants AM-Med, David Soblick, Aronoff, McKeon, MBKD, Countrywide Medical, and Does 1-100)

227.    Relators Yarbrough and Fletcher incorporate all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

228.    The False Claims Act imposes liability on any person who knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

229.    Defendant AM-Med by and through its owners Defendants David Soblick and Aronoff, officers, agents, supervisors including Defendant McKeon, employees, its parent company Defendant MBKD, and through Defendant Countrywide Medical knowingly made or caused to be made a false record or statement to a false claim when it created false narratives in

the patient notes so it could send products and refills to beneficiaries, sent beneficiaries used products, sent beneficiaries products that were different than what was ordered, and sent products based on physician signatures without medical necessity.

230.   Defendant AM-Med by and through its owners Defendants AM-Med, David Soblick, Aronoff, and McKeon knowingly made or caused to be made a false record or statement to a false claim when it falsified documents in response to an OIG subpoena.

231.   Defendants Does 1-100 Medical knowingly made or caused to be made a false record or statement to a false claim when they signed physician prescriptions without medical necessity.

232.   The result of Defendants' actions has led the Government to pay for medically unnecessary devices and supplies, which Defendants received payments of millions of dollars from the Medicare, Medicaid, and TRICARE programs.

233.   The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## COUNT III
### Violations of the Florida False Claims Act, Fla. Stat. § 68.082(2)(a)
### (against Defendants AM-Med, David Soblick, Aronoff, McKeon, MBKD, and Countrywide Medical)

234.     Relators Yarbrough and Fletcher incorporate all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

235.     The Florida False Claims Act imposes liability on any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.  Fla. Stat. § 68.082(2)(a).

236.     Defendant AM-Med by and through its owners Defendants David Soblick and Aronoff, officers, agents, supervisors including Defendant McKeon, employees, its parent company Defendant MBKD, and through Defendant Countrywide Medical  knowingly presented or caused to be presented claims to obtain payment from Medicaid for devices and supplies that were not physician approved or properly physician approved, and thus, were medically unnecessary; devices and supplies that were sent to deceased beneficiaries after their death; devices and supplies that were sent without authority or authorization; and devices and supplies that were medically unnecessary, such as braces, but sent in addition to medically necessary products.

237.     The result of Defendants' actions has led the Government to pay for medically unnecessary devices and supplies, which Defendants received payments from Medicaid.

238.     The State of Florida has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## COUNT IV
### Violations of the Florida False Claims Act, Fla. Stat. § 68.082(2)(b)
(against Defendants AM-Med, David Soblick, Aronoff, McKeon, MBKD, and Countrywide and Does 1-100)

239.    Relators Yarbrough and Fletcher incorporate all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

240.    The Florida False Claims Act imposes liability on any person who knowingly presents or causes to be presented a false or fraudulent claim for approval.  Fla. Stat. § 68.082(2)(b).

241.    Defendant AM-Med by and through its owners Defendants David Soblick and Aronoff,  officers, agents, supervisors including Defendant McKeon, employees, its parent company Defendant MBKD, and through Defendant Countrywide Medical knowingly made or caused to be made a false record or statement to  a false claim when it certified to Medicaid that it is performing services in compliance with Medicaid regulations when Defendants falsely certified compliance when they claimed to have beneficiary consent for devices and supplies, sent beneficiaries used products, sent beneficiaries products that were different than what was ordered, sent products based on physician signatures without medical necessity, and Defendants Does 1-100 signed physician prescriptions without medical necessity.

242.    The result of Defendants' actions has led the Government to pay for medically unnecessary devices and supplies, which Defendants received payments from Medicaid.

243.    The State of Florida has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## COUNT V
### Violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)
### (against Defendants AM-Med, David Soblick, Aronoff, McKeon, MBKD, and Countrywide)

244.    Relators Yarbrough and Fletcher incorporate all of the allegations set forth in the foregoing paragraph as though fully alleged herein.

245.    The Anti-Kickback Statute prohibits offering, paying, soliciting, or receiving anything of value to induce rewards, referrals, or general federal health care business, including Medicare and Medicaid.  42 U.S.C. § 1320a-7b(b).

246.    Defendant AM-Med by and through its owners Defendants David Soblick and Aronoff,  officers, agents, supervisors including Defendant McKeon, employees, its parent company Defendant MBKD, and through Defendant Countrywide Medical knowingly and intentionally waive and fail to collect copayments required of beneficiaries to induce beneficiaries to order with AM-Med and generate reimbursements from Medicare, TRICARE, and Medicaid.   AM-Med receives rebates and discounts from Johnson & Johnson for blood glucose meters, and as a result, Defendants only carry Johnson & Johnson blood glucose meters and will send the Johnson & Johnson meters to beneficiaries even if they request another brand. Additionally, Defendants pay at least two vendors, DocsDepot and ByteSuccess, to obtain signed prescriptions from doctors in exchange for compensation.

247.    The result of Defendants' actions has led the Government to pay for items that resulted from prohibited activities under the Anti-Kickback Statute in order to generate financial compensation for AM-Med at the expense of the Government through its Medicare, TRICARE, and Medicaid programs.

248.    The United States of American has been damaged by the misrepresentations and failures to comply with the requisite laws and regulations in an as of yet undetermined amount.

## COUNT VI
### Violations of the Anti-Solicitation Statute, 42 U.S.C. § 1395m(a)(17)
### (against Defendants AM-Med, David Soblick, Aronoff, McKeon, MBKD, and Countrywide Medical)

249.    Relators Yarbrough and Fletcher incorporate all of the allegations set forth in the foregoing paragraph as though fully alleged herein.

250.    The Anti-Solicitation Statute prohibits suppliers from making unsolicited contacts to beneficiaries, including telephone calls, and prohibits payment for items furnished subsequent to unsolicited contact.  42 U.S.C. § 1395m(a)(17).

251.    Defendant AM-Med by and through its owners Defendants David Soblick and Aronoff,  officers, agents, supervisors including Defendant McKeon, employees, its parent company Defendant MBKD, and through Defendant Countrywide Medical knowingly and intentionally solicit beneficiaries by purchasing beneficiary lists and directly marketing to beneficiaries.

252.    The result of Defendants' actions has led the Government to pay for items that resulted from prohibited solicitation.

253.    The United States of America has been damages by the failure to comply with requisite laws and regulations in an as of yet undetermined amount.

## COUNT VII
### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C)
### (against Defendants AM-Med, David Soblick, Robin Soblick, Aronoff, McKeon, MBKD, Countrywide Medical, and DOES 1-100)

254.    Relators Yarbrough and Fletcher incorporate all of the allegations set forth in the foregoing paragraph as though fully alleged herein.

255.    The False Claims Act imposes liability on any person who conspires to commit a violation of the False Claims Act, including any person who 1) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; or 2) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(C).

256.    Defendants AM-Med, MBKD, David Soblick, Aronoff, McKeon, Robin Soblick, Countrywide Medical, and DOES 1-100 entered into a conspiracy and took actions in furtherance of its conspiracies to defraud the United States Government to get fraudulent claims approved and paid for by Medicare, TRICARE, and Medicaid.

257.    The result of Defendants' actions has led the Government to pay for medically unnecessary devices and supplies, which Defendants received payments of millions of dollars from the federal Medicare program, TRICARE program, and numerous state Medicaid programs.

258.    The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## COUNT VIII
### Violations of the Florida False Claims Act, Fla. Stat. § 68.082(2)(c)

**(against Defendants AM-Med, David Soblick, Robin Soblick, Aronoff, McKeon, MBKD, Countrywide Medical, and DOES 1-100)**

259.    The Florida False Claims Act imposes liability on any person who conspires to commit a violation of the Florida False Claims Act, including any person who 1) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; or 2) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.  Fla. Stat.  § 68.082(2)(c).

260.    Defendants AM-Med, MBKD, David Soblick, Aronoff, McKeon, Robin Soblick, Countrywide Medical, and DOES 1-100 entered into a conspiracy and took actions in furtherance of its conspiracies to defraud Florida to get fraudulent claims approved and paid for by Medicaid.

261.    The result of Defendants' actions has led the Government to pay for medically unnecessary devices and supplies, which Defendants received payments from Medicaid.

262.    The State of Florida has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## PRAYER FOR RELIEF

WHEREFORE, Relators Yarbrough and Fletcher, acting on behalf of and in the name of the United States of America, and on their own behalf, prays that judgment will be entered against Defendants for violations of the Federal False Claims Act, 31 U.S.C. § 3729 et seq.; the Florida False Claims Act, Fla. Stat. § 68.081 et seq.; and the Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7b(b), 1395m(a)(17) as follows:

a)  That for violations of the False Claims Act, 31 U.S.C. §3729, et seq., this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of the Defendants' actions, plus a civil penalty of $11,000 for each act in violation of 31 U.S.C. §3729;

b)  That for violations of the Florida False Claims Act, Fla. Stat. § 68.081, et seq., this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of the Defendants' actions, plus a civil penalty of $11,000 for each act in violation of Fla. Stat. § 68.081, et seq.;

c)  That Relators Yarbrough and Fletcher be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d),  including the costs and expenses of this action and reasonable attorneys' fees;

d)  That for each violation of the Anti-Kickback Statute, this Court enter Judgment against Defendants for the maximum civil penalties;

e)  That for each violation of the Anti-Solicitation Statute, 42 U.S.C. § 1395m(a)(17), this Court enter Judgment against Defendants for the maximum civil penalties; and

f)  That the United States Government and Relators Yarbrough and Fletcher receive all other relief, both in law and equity, to which they are reasonably entitled.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators Yarbrough and Fletcher hereby demand a jury trial.

January 21, 2016

Respectfully Submitted,

_____
R. Scott Oswald, Esq. (Bar no. 158437)
David Scher, Esq. (to be admitted *pro hac vice*)
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2803
(202) 261-2835 (facsimile)
dscher@employmentlawgroup.com
soswald@employmentlawgroup.com

Attorneys for *Qui Tam* Plaintiffs